The next case on the docket is 524-1090 Barter-Storm et al. v. Country Mutual Insurance Co. Mr. Pianka and Mr. Berg and Mr. Becker. Mr. Berg and Mr. Becker, you're going to split your time? We are. I'm not responsible for keeping track of that, so the clerk will help you out on that. You do? Okay. You want to use your iPad? Okay, that'll be allowed. I'm more concerned about people using cell phones in the gallery, okay? Or we allow computers and things of that nature during argument. Thank you. Thank you, Mr. Berg. Yes. Mr. Pianka, on behalf of the appellant, Barter-Storm, you may proceed when you're ready, sir. Thank you. Good morning, Your Honors. Good morning. I'm Edmund Pianka. I represent the plaintiffs Brandi Barter-Storm and Christopher Storm, her husband. The defendants are Country Mutual Insurance Co. and Agent John Kent. Brandi and Chris have been renovating their former residence in Mattoon for about 16 months, preparing it for sale when it sustained major fire damage. Country Mutual denied their claim under a policy they'd had for five years on the ground that prior to the fire it had canceled the policy due to a missed premium payment. But whether Country Mutual did or didn't cancel the policy is not the issue in this appeal. That issue has not been tried. This is an appeal from a summary judgment. As to Country Mutual, the only issue is whether there is a genuine issue material fact as to whether the policy was properly canceled. Country Mutual has the burden of proof on that. All inferences must be drawn in plaintiff's favor. The pleadings, depositions, and exhibits must be construed strictly against Country and in favor of Brandi and Chris. The standard of review is de novo. There's no question, is there, that briefly a premium was not paid? If I understood it correctly, there was some problem with a debit card or a credit card, some payment? That's right. That was remedied? I'm sorry. That was remedied, though? The payment was eventually made and then a later claim of mispayment? Or are they all talking about the same alleged mispayment? I'm sorry. Would you say the question again? My understanding is when the missed premium was raised, the policyholder made arrangements to correct that and the premium was paid. Is that correct? There was an incident in April of 2021. The cancellation was in July. There was an incident in April of 2021 where she had, Brandi was the insured, and she kind of managed this policy. And there was an incident there where apparently it was set up at that time to charge to her debit card, her bank debit card, and it didn't go through for some reason. She wasn't sure why. When she got that notice, she did get that notice, she then immediately paid the premium and the policy was reinstated. So the alleged mispayment now is some other incident that came later is what the insurance company is claiming? The problem in this case was in July. There was a payment due July 9th, 8th, I think. And apparently the same thing happened in that case. The issue is whether country properly notified her. Well, first of all, the agent said not to worry about it. It's been covered. Is that right? No, Your Honor. That's a different payment.  What happened was in July, the payment was due on the 8th, and the premium could be paid in one of three different ways. It could be paid by escrow with the bank. It could be paid by a direct debit from her credit card, or she could have been sent a premium notice, which she testified that was her preferred way to do it, was to have them send a premium notice so she could control when it was paid. She disputes receiving the notice from country, correct? And the bank also says they didn't get a notice either? There's nothing in the bank's file? In July, it's not clear, and she was not clear, which way that policy was set up. This was on her former residence in Mattoon. They now live in Urbana. But she and Chris had four other properties in Mattoon. They were schoolteachers, but they had a business. Schoolteachers need more income, of course. They had this business of buying and renting houses. And there were four rental houses in Mattoon, plus their residence, which they were now preparing to sell. There was some confusion. She was not clear about how the premium payments were set up on all of those policies. So if you look at the exchange between her and the agent, John Kent, in October and November, it's apparent that she thought that the premium on this account was escrowed with the bank. It wasn't. But she wasn't sure which of the properties, at any given point, were done by escrow with the bank or by direct debit or by premium notices. So that's where the confusion came up. And so what happened was they sent a notice of cancellation. They said they did. Sent a notice of cancellation. That's the issue, of course, to her in July. She testified that she did not receive it. And, of course, on summary judgment, we have to accept that, unless it's totally incredible, because that would be an issue to the jury, whether they believe that she did not receive it. So they then supposedly sent a cancellation notice effective July 27th. That was what she didn't receive. She didn't receive that notice. She may or may not have got a premium notice. She didn't remember. This was several years back. She didn't remember all the bills she had received during those times. But they say they sent a cancellation notice to her sometime in July. Under the policy, they had to give her 10 days' notice of cancellation. So they sent her a notice, supposedly, that it would be canceled effective July 27th. And she didn't get that notice. But, of course, then she didn't get any more premium bills because they canceled the policy. I believe Justice Bonnet asked you about the bank. There was testimony from the bank, someone at the bank, that there was not a receipt of notice in the file of the cancellation. Is that correct? That's correct. All right. And I believe there was testimony from someone at the insurance company that they sent out batch notices. Is that correct? Am I correct in that recollection? You're talking about Rhonda Long's testimony about the— Yeah, I'll call her name. About— There was batch notices that went out, correct?  So that means it's certified mail or the like. No, it wasn't. It was a batch mailing. See, we have three genuine issues of fact here. One is whether the notice was mailed to Brandy. Another one is whether it was mailed to the bank. A third was whether it was mailed to Chris. And there's no evidence in the record that it was mailed to Chris. But under the policy, they were required to send that notice to, quote, you. And they defined you in the policy as the insured, who was Brandy, and the insured spouse if resident of the same household. It doesn't say all. It says and. So they were required to send notices of cancellation, which is a very important notice, of course. They were required to send it to her and to Chris because, obviously, that doubles the chance that it will be received and acted on. There's no evidence that they sent that to Chris. But going back to your question about the batch notices, under Section 143.14 of the Insurance Code, the insurance company is required to keep proof of mailing in a form acceptable to the post office. And this court, in the Reagan case, said that if they don't comply with that, then the cancellation is ineffective. So what happened in this case, of course, we argued in the brief, that the cancellation notice was ineffective for multiple reasons, one of which was they didn't have a proper certificate of mailing. They had these two certificates of mail. They had a letter that said certificate at the top, but that's obviously not a proper post office form. These were post office forms from batch mailings in Texas, in Texas. And the form itself, and there were almost 500 envelopes in this batch mailing. And the form itself, the post office form, which they rely on, says this certificate does not provide evidence that a piece was mailed to a particular address. So there's no evidence that the cancellation notice was sent to Brandy, particularly because it was part of a batch mailing, and particularly because, I'm sorry? But the trial court made a determination that there was proper notice, correct? Yes, because the trial court took the document at face value. But the individual who testified to the authenticity of the documents had no direct knowledge of the individuals? He had no questions. I think he was from Indiana, wasn't he? Ron DeLong, he was a manager in the home office of Country in Bloomington, Illinois, not in Texas. He was in Bloomington, Illinois. They brought him in because they handed him the file, and they brought him in to deposition, and they said, we want you to testify to this proof of mailing. But, of course, he had no personal knowledge whatsoever of a mailing, a bulk mailing in Texas. Anyone could have been riding off the street to give the same testimony as Ron DeLong. All he did was he looked at the file and said, yep, this was in the file. Mr. Kanka, there was no address for your client in the bulk mailing, was there? I'm sorry, Your Honor? No address was listed? No. In the bulk mailing, was there an address listed? Well, they attached to the certificates, Country, in their motion, they attached what appears to be a list of hundreds of addressees, and one of them they blacked out all the others except one, which was Brandi's address. Was that her home address or the address of the burned-up property? It was her home address. Okay. In fact, that's another point. The notice did not give the address of the property. So, if either she had received it, she would have been confused about that. So, wait, you're saying that the notice went to her home address, but it didn't reference the subject property.  That was in fact her map, and she had multiple properties. That's correct. All right. That's correct. Thank you. Exactly. So, Rule 191, Spring-Ford Rule 191 says that in support of a motion for summary judgment, affidavits and deposition testimony must be based on the affidavit's personal knowledge, and a deposition can only be used if it meets the affidavit requirements, including the requirement that it be based on personal knowledge and consist of facts, not conclusions. He had no personal knowledge of this. Now, of course, they say, well, he testified that we followed our normal procedure, but he had no personal knowledge of that either. You know, I read his testimony, and did he use the business records exception under the rules? No, because this is covered by Section 143.14. They have to comply with 143.14. So whether this was in their file, they could use the business records exception, I guess, to show that it was in the file, but that doesn't prove anything. What they have to do is prove that this was the mailing from Texas that included the envelope that included the notice to Brandy. Well, there was no connection between that certificate and the letter that was mailed to Brandy. We don't know if that letter got in that envelope, do we? But again, the important thing is, what we're talking about here is, is there an issue of tribal facts? These are questions for the jury. Did they mail a proper notice to Brandy, or did they mail a proper notice to the bank? We have detailed in here even more powerful evidence that they did not mail a notice to the bank. They had no certificate for the mailing to the bank that anyone testified complied with rule, excuse me, Section 143.14. No one testified to that. In addition, Ron, excuse me, President Jeffords, Todd Jeffords of the bank, and Lisa Kirkwood of the bank, came in and testified that they looked at their file, and there was no letter in the file to the bank. And if they had received the letter, what would they have done? The first thing they would have done is someone from the bank would have called Brandy and said, hey, we got a cancellation notice of this policy. What's up? And then, of course, she would have immediately paid the premium. She always did. So that's strong evidence that the bank never received the notice. Didn't the bank justify they would have made the payment? Exactly, and that's the third point on the bank, Your Honor. If she had not paid it immediately, the bank would have forced-placed coverage. That's what banks always do. Mortgagee banks always force-place coverage so that they're sure there's insurance on the property. If they didn't do that, that's also powerful evidence that the notice was never sent to the bank. Mr. Kiatka, I recognize your time is up, but I have a question for you. One of the issues you've raised on appeal is whether the trial court abused its discretion when it denied the plaintiff's motion for leave to file an amended complaint to add Count 6, alleging estoppel. Yes, Your Honor. Tell me how that would impact the motion for summary judgment, if at all. It wouldn't impact it at all. Well, this was a motion after summary judgment, and we've cited the provision of the Practice Act that says that after summary judgment, before or after summary judgment, you should be allowed to amend the complaint. Well, the rule is you have discretion, of course. The cases all say you have discretion. But as we know, there's discretion, and then there's discretion. And sometimes discretion is circumscribed by the law. And in this case, that law is the Loyola Academy case. And so we've discussed the Loyola Academy case in detail in our briefs. There are four factors there that help guide the trial court in determining whether to allow the amendment. And we've shown in our brief that the most important factor is whether it will correct a defect in the complaint. It's clear in this case because we sought to add not equitable estoppel. The defendants are confused about this. It's estoppel in the insurance context, which has different elements than traditional garden variety equitable estoppel. So that would have cured it. In addition, the overriding factor, the Supreme Court has said, in Loyola Academy and other cases, is the interest of justice. Would it be in the interest of justice to allow the amendment in this case? And this is a perfect case for the interest of justice allowing the amendment. Okay. And one other question is you have filed a motion to supplement authorities. Yes, Your Honor. And you cite the Monroy-Perez v. Century Select Insurance case that came out in May of 2025. Yes, Your Honor. Do you believe that that is a new statement of the law such that the other parties should have a right to respond to this case? Well, I mean, we have no problem if they want to respond to it. But it is simply another case. We've cited half a dozen cases in our brief where the court recognized this form of estoppel, the estoppel in the insurance context, and there are these three elements, some act or conduct or non-action of an insurer, reliance, and prejudice. And that's all that's required. The case that we cited is simply the most recent case in that line. But it's also important because it says you can also have misrepresentation by silence. And that's, in effect, what happened in this case. Kent knew because he looked at his file. He knew that this policy had purportedly been canceled. But when Brandy called and emailed him, and this was about a payment not for the premium but for a partial premium between the date of the premium and the cancellation. So this was a past premium. He said, don't worry about it. Don't worry about it. It's all taken care of. You paid it. She had paid it. But he said, tell me, are you paying this or is the bank paying this? Now, any reasonable person would say that means this policy is still in effect. If she had not paid the premium, and I think this is an important point. If she hadn't paid the premium, she owed the premiums. But that has nothing to do with the validity of the cancellation. If she hasn't paid five months of premiums, they can deduct that from the payment for the loss. That's fine. She owes the money, but that's a completely separate issue from the cancellation. All right. Thank you. No other questions? Thank you. No questions. Thank you. Okay. Gentlemen, we're going to give you a few extra minutes. Come on up. I just want the clerk to give him a couple minutes extra since Mr. Kiyanka went over due to my questions. I have a question for you, though, right off the bat. Yes, sir. Let's have you state your name for the record first.  My name is Gregory Burke. I represent Apelli Country Mutual Insurance Company. As indicated in our brief, regarding plaintiff's allegations of negligence against Country for the actions of its agents, John Kent, and the plaintiff's appeal of the court's denial of its motion for leave to amend their complaint, we adopt Apelli Kent's arguments and join in asking the court to affirm the trial court's ruling on those issues. With that in mind — On the issue of amending the complaint? On the issue of amending the complaint, we adopt their arguments. I also made arguments, but he's going to be arguing it today. That is what I'm telling the court. And that is why I'm going to ask that I only be allowed seven and a half minutes to allow him whatever remainder. Okay, Mr. Burke. Yes. My question for you very quickly, though, is the appellant filed a motion to supplement authority, which we took with the case. Mr. Kiyanka has told us why it's important. It relates to the issue of estoppel by insurance. Do you feel a need to respond to that on behalf of the insurance company? I would ask for leave to file a memorandum in response, following the argument. But, again, I'm deferring to my colleague, who's going to be arguing that issue. Okay. Well, can you file a joint memorandum? Yes, Your Honor. Okay. I believe we can. Is that okay? That's fine. All right. We'll limit you to seven pages on that. But can you do that in 10 days? Certainly. Okay. All right. Thank you. That takes care of our administrative work. Great. You may begin. I appreciate it. I'm here primarily to argue, as I said, whether this Court should affirm the trial court's granting summary judgment in favor of country relative to plaintiff's allegations of breach of contract and bad faith. I'll refer to the plaintiff's plural as Brandy because, as the appellant's counsel identified, Brandy was the primary caretaker of her insurance accounts as well as the properties. She had four properties. They were all insured. She had all communication with country and with its agents, relative to securing insurance coverage and for all the plaintiff's various properties and, for the most part, maintaining coverage or reinstating coverage when it was about to be canceled for nonpayment, which happened more than once. Brandy was not unsophisticated. I don't want you to get that impression based on what the appellant's counsel has attested today. At one time she convinced her mortgagee to pay the annual homeowner's insurance premium without having to refinance her home out of escrow that was supposedly dedicated to the property tax payments. She convinced them and was to replenish that amount before the tax lien became due. At another time she arranged with country to shift from making lump sum annual premiums to making monthly installments via automatic debit card. Counsel, how is her expertise relevant? Is it relevant here, the sufficiency of the notice? You're absolutely right. But I want to address these other issues. Sure, sure. But, I mean, isn't the question, though, was the notice proper and does the record actually reflect that? So it's our position, actually, that the notice was proper. And the notice was proper in several ways. One, it was timely. It was sent to the insured and their lien holder at the lien holder and insured's last known address, which is required under the policy and under the Act, the code. Is that the Oregon address? It was, yes, the Oregon address. For the insured. And it was the Main Street address for the bank. Those were the addresses that were on file with country, so they sent those notices to the last known addresses. We know that they were the last known addresses because both Brandi and the bank personnel admitted, testified under oath, that they had received prior notices at those addresses. Brandi even testified that she had received subsequent mailings at that same address from the insurance carrier as well as from a collection agency after her policy had been canceled for payment of the premium that hadn't been paid for coverage that had been already extended. So the address is not an issue. Was it timely? It was, again, our position is that it was properly mailed at least ten days in advance of the cancellation date. In these days, it was mailed ten days before July 28th. Greater than ten days, actually. It was mailed on or before July 15th, 2021. Noticing that your policy is going to cancel or terminate by this date certain. That's what the notice said. Now, the question about whether the mailing was proper is the big issue, and you're absolutely right, Your Honor. Isn't there a question of fact as to whether the notice actually got mailed? See, this is where I question the question of the Appellant's counsel, and here's why. The question is whether Ron DeLong is able to testify regarding his knowledge of the actual mailing on July 15th to both the lien holder and to Brady. He did not actually stuff the envelope, seal the envelope, and mail the envelope, no. But he did have knowledge of the mailing. He had knowledge of the mailing based on documents that were already forwarded to, based on documents that he had access to and that had already been provided and discovered to the other parties. Those documents were country's records indicating this is the mailing on this date, and it was a bulk mailing, and it was by certificate of mailing, not certified mail. Certificate of mailing was what was required under the U.S. Postal Rules, which is acceptable under the Code as well. Somebody took Ron DeLong, who was an executive with Country Mutual, and put him with these records, and somebody said, these are the business records of our company. And so he was put out there to testify to that. He had no personal knowledge of this. Well, he did in that he has background, education, experience, a number of years in that area, and had personal knowledge with mailing of, and what was involved in mailing, bulk mailing, and what was required under the Code. He had complied with that over the years in his experience with Country. And that's where his knowledge came from. I have a question to Mr. Kiyonka. That's a business records kind of exception where you know what the usual custom and practice of the insurance company is and things like that. How does that square with complying with the Code? Well, not only does he have knowledge of the practices of the business, this is what happens when there's a cancellation. Automatically we generate this letter to this individual. But he couldn't produce the letter that was generated to this individual. We did produce it as far as a certificate of mailing, and it was produced in advance in discovery. And he testified regarding his actual, his knowledge of viewing those documents, and he was able to opine based on his knowledge of those documents that, yes, there was a mailing on such and such a date that was mailed to this individual. Counsel pointed out that there was one document that was almost entirely redacted that indicated this is Brandy's address, and it was the right address. Now, he said, well, it wasn't identified. There was another document that didn't identify the property address. Well, it identified the policy applicable to that property. And that's where the match occurred. It had the numbers of the policy on it, didn't it? I'm sorry? It had the reference to the policy numbers. Correct. For that policy, for that address. For that policy and that address. For that one particular mailing. But the other mailings all identified the property and the policy. Why was that mailing different? That I'm not sure of. I know that we have a copy of the letter, the certificate of mailing that was sent to Brandy. She says she's never received it. We provided that document in discovery. So that indicates the address. It indicates the policy number. It indicates what applies. There's the bulk mailing record that the company is required to keep pursuant to the code that it meets the U.S. Postal Service's requirements for keeping these records. And how do we know it meets the U.S. Postal Service requirements? Rond alone. Rond alone, who is an executive with your company who has no background in U.S. Postal Service. My question, Your Honor, then would be how would a party prove that? Possibly from the Postal Service. Certainly. That's obvious to me. If necessary. But in this case, the question was regarding Rond alone's ability to testify regarding that, whether it was mailed in the normal course and scope of the business and whether this record was mailed to this particular address. He was able to testify to that. He was also able to testify that based on his knowledge, experience, and education, it was compliant with not only the policy but also the code. Don't you think that you have on one side the proof of mailing and then you have two parties, not one, but two parties who said they didn't get it, two totally unrelated parties with different interests. I would suggest to you, Your Honor, that they're not unrelated. The bank holds all the mortgages for that particular. If there are two separate parties who both claim they didn't receive this notice which you claim was sent, you don't think that raises a question of fact? I don't believe it does. I think all that is necessary is that the company proves that it mailed. And in our case, I believe that we've done that by way of that expert testimony, which can be considered. It's like an affidavit or a deposition or whatever. You didn't qualify your witness as an expert. I did during the course of his deposition, his training, experience, education. We also disclosed that in discovery with our witness disclosures. This case was anticipated to go to trial. Did you make him an expert witness under F-3? I'm sorry? Did you make him a witness under 213 F-3? I don't believe it was a 213 F-3. It was listed as general witnesses. I don't think it was specifically listed as an F-3, but it did list him with the qualifications as an F-3. It did. His background, experience, education, and what he was going to testify to, and the basis for his testimony. So all those requirements were met in the disclosure. And then he testified. And he was deposed by the plaintiff's counsel, and they had an opportunity to ask him about all of those issues. And then I had an opportunity to cross-examine him under those issues as well, to establish his expertise, to establish his knowledge that this was mailed. To get his testimony, he was very aware of this particular incident because he had looked at those records of mailing to this individual and to the bank. And he testified to those facts under oath, his personal knowledge. Was the document that Mr. DeLong relied upon for proof of mailing verified by affidavit under Rule 191? It was verified under the testimony of Ron DeLong. But it didn't comply with Rule 191? It wasn't submitted in that way. He testified under oath that these were the documents he reviewed, but no. Okay. So your understanding is it would have complied through testimony as the witness? My understanding is that he did lay the foundation based on his testimony. Okay, thank you. Thank you. You'll have. No, I guess you won't. Okay. I have another question. I guess a motion for summary judgment, when you view the evidence in the light most favorable to the non-moving party, you've got two witnesses on the other side who say, we didn't receive this notice. I don't know how a motion for summary judgment survives then when you have those two witnesses clearly contradicting Ron DeLong's testimony that it was properly mailed. And so isn't that now a fact question, a credibility question for the jury ultimately, not for a motion for summary judgment? So my argument, Your Honor, would be that the country has come forward with at least to establish a rebuttable presumption that mailing had been done based on Ron DeLong's testimony. What would plaintiffs have to do to rebut that presumption? Did they merely say, oh, we didn't get it? How likely would it be that a plaintiff would say that? Wouldn't they need more? And the argument would be, yes, they would at least need an expert on their side saying, no, this was not properly mailed. No, you didn't follow the U.S. Postal Service's guidelines. Maybe somebody from the Postal Service could do that for them. But they didn't do that. So they didn't effectively rebut the presumption. And that's why I think the court should grant a summary judgment or affirm the lower court's summary judgment. What is the ultimate test? Is it that the insurance company mailed it or the proof that the insured received it? The ultimate test is that the insurance company mailed it in a timely manner, pursuant to the policy and the code, to the address, the last known address of the insured. And if there's a mortgagee or a lien holder, to the last known address of the lien holder. Again, timely, meaning at least 10 days in advance of the termination date or cancellation date. And finally, that it was properly mailed. Now, what does properly mailed mean? Pursuant to the U.S. Postal Service's requirements under the code, and that would include that it could be in a batch mailed by certificate of mailing, not certified mailing, by certificate of mailing for large companies like this, like Country, like State Farm, that do these large batch mailings. What's sufficient for those companies? What's acceptable for those companies? And that is that you keep record of this mailing. They did. You keep record that it was mailed to that address. They did. So you met those requirements. Now, I believe that shifts the burden to the plaintiffs to rebut that presumption that it was mailed properly, other than by just saying, oh, we didn't get it. And the batch mailing showed the bank's address. I believe it does. I believe it does. We provided that as well. Okay. Thank you. Thank you. Just one more question. Okay. Thank you. Thank you, Mr. Bergeron. Mr. Becker? Thank you, Your Honor. My name is Alan Becker, and I represent John Kent. John Kent is an exclusive agent for Country. As an exclusive agent for Country, under the Zanini decision, his common law duties are owed only to Country, not to the insured. So the duties that he has are only the duties that are spelled out in Section 2-2201. Can you be both? Can you be an agent and a broker? In some circumstances, you can, but when you're by contract are exclusive to the insurance company, you cannot also be the agent for the insured. What if you voluntarily undertake that responsibility? If you undertake any responsibilities that are not legal duties but are voluntary acts, it comes under the Voluntary Acts Doctrine, and under the Katuna decision, you can only be liable for negligence if your voluntary act causes personal or physical damage to personal or property. But under that decision, which also has been applied to insurance agents, you cannot be liable for a negligent voluntary act if it only results in economic loss. Okay. I thought you said you could be liable for negligence, for your negligence in the voluntary undertaking. If it causes physical damage to a person or property. Right. But his acts didn't cause the fire. But if you say to somebody that everything's taken care of, it's okay, and that's not true, you don't think that the receipt of that knowledge is sufficient to raise a question of fact as to whether or not he did a voluntary undertaking that may or may not have caused harm to the plaintiff. Since the only harm that's alleged is economic loss, the Supreme Court decision in the Katuna case precludes a claim against him for that. So it's not necessary to actually reach that question. And, of course, in the facts and the facts as to the communications between the parties, as Mr. Kent and Brandy are set out in writing, there is no general undertaking by Mr. Kent, nor is there a statement that everything is all right. The only specific statement that he made is that I checked And you did make that payment of that past due amount for the insurance that you were given. Under the Scaberdas decision, the legal duty is only to respond to a specific request. What is the specific request that the plaintiff cites? In her e-mail, Brandy says, please help. The Supreme Court said that a vague request for coverage is not sufficient. It has to be a specific request. So his legal duty was not triggered. Even if you take anything that he did as a voluntary act, then there is no claim for damages against him in this case. There's been a reference in the argument about misrepresentation by silence. And counsel, in their reply brief, cited the decision in Boven v. American Family Life Insurance. And they cited some general language about negligence. But what they didn't cite is the actual holding in the Boven decision. And the actual holding is, and I'll quote, absent an agency relationship between the agent and his customer, no duty is imposed upon the insurer's agent to notify plaintiff of facts detrimental to the insured, for lack of which negligence liability will lie. The Boven case directly supports our position and is contrary to plaintiff's claim. That case is cited in your brief. That case is cited in, was raised in the reply brief by the plaintiffs. Okay, and could you spell the name of that case? Yes, Boven, B-O-V-A-N, versus American Family Life Insurance. And the citation is 386, Illinois Appellate III, and at 933 and 940. Thank you. Now, I'd like to take a moment, if I can, to address the estoppel and the motion to amend to raise estoppel. And in the trial court, we pointed out that a plaintiff who wants to make an estoppel claim is required to raise it in its initial pleadings. The plaintiff never did that. We raised that argument that estoppel was waived. We also have raised that in our briefs on this appeal. In the recent Monroy-Perez case, the court noted and approved the principle that if you don't raise estoppel, it's forfeited. The reason that they went ahead in the Monroy-Perez case was because the insurance company in the appeal did not repeat its objection and its claim that the estoppel had been waived. That doesn't apply here. But it used waived and forfeited. They're two different concepts. Which is it? Which are you talking about? If you don't raise it, you're waived. Well, the statute uses the term waiver. Okay. You had mentioned forfeiture. The court has said forfeiture, but I believe that in this context it's the same. Well, they're not the same. Okay, so we're waivered. We're waivered. We've cited the statute and we've cited the Humboldt decision that says if you don't raise estoppel in your pleadings, that it's waived. And it was never mentioned until after the summary judgment in this case. So you're familiar with this Perez case that was cited by you? Well, it was cited to us and we've read it. Okay. And it does not impose ‑‑ it only relates to an insurance company. It does not relate to an insurance agent. It does not impose any duty on an insurance agent. As far as ‑‑ or make anything about a misrepresentation by silence. It's not in any way inconsistent with the Bovin decision. What is the standard of review for the denial of the motion to amend? It's abuse of discretion. And in this case ‑‑ Even after summary judgment. Even after summary judgment. It's still an abuse of discretion. There's not an absolute right to amend after summary judgment. And that's ‑‑ I don't think that's even been claimed by the plaintiffs. And there was no abuse here because plaintiffs conceded that estoppel was not an independent cause of action. They only called it ‑‑ it was an additional theory. It was a theory that they could have raised beforehand. They did not cite any new facts to support estoppel in their motion. They relied solely on what had already been established in the case. And therefore, their claim for estoppel, their reliance on other cases, those other cases all involve situations where after the summary judgment, which was typically at a very preliminary stage in the case, like on a motion to dismiss, the plaintiff came back and said, wait, there are additional facts we'd like to raise. And that's not what they did here. They said ‑‑ in fact, they said, we intentionally withheld this to see what the result would be on the summary judgment. That was admitted by counsel during the argument. And that's just an improper tactic. I'll just quote, we've cited this in our brief, in the tire and trucks case. It is inappropriate to engage in piecemeal litigation, seeing one theory of the case to conclusion before proposing another. That's exactly what the plaintiffs are trying to do here. They proceeded with the case. They argued the case on one theory. The judge found summary judgment in favor of both defendants. They're totally different claims. And then they come in and they say, oh, we'd like to try a different theory. That's simply not proper procedure. And the court was well within its discretion to deny the motion from it. Hypothetically, if this case would be reversed, do you think that the court would be within its discretion to allow a theory of estoppel if the proceedings go back to the original complaint? I mean, is it because this summary judgment had already been entered that you think the court said you can't come in with another theory now? Well, I think we raised that in our arguments when we were opposing the motion to amend. That it should have been done. That it should have been done in the beginning, or at least raised during the summary judgment, rather than hold back to see what would happen in the summary judgment. And as far as estoppel and as far as Mr. Kent, what is it exactly that they seek to estoppel? Estoppel is typically used to prevent the party from raising some sort of affirmative defense, like the statute of limitations, or a failure to perform some contractual obligation. But going back to your statement about piecemeal and the hypothetical that Justice Cades asked, would it be piecemeal if, in fact, the court would hypothetically reverse the summary judgment? Wouldn't it be starting over sort of from scratch then? Well, first, I don't think we would be starting from scratch because there's still the summary judgment, and the things that have been established in the summary judgment would not be reversed if you simply were going to back to argue estoppel. But what would estoppel add as to the claim against Mr. Kent or against the country, for that matter? The plaintiffs never made clear exactly what it is that they wanted to be estopped, but they admitted that there's no separate cause of action for estoppel. And as to Mr. Kent, what would he be estopped? He wasn't raising an affirmative defense that he would be estopped from pursuing. He wasn't raising a statute of limitations. Mr. Kent was saying, I didn't have a duty, and estoppel can't change whether he has a duty or not. He simply didn't have a duty to tell the plaintiff that the policy had been canceled. The Insurance Act says that the insurance company has the responsibility to do those notices. It doesn't apply to the insurance agent. And he was asked a very specific question by Brandy. I got this collection notice. It says I owe $329. Is that correct? And it happened that the collection notice was dated five days before she made the payment. And he checked with country and came back and said, you paid that, so you can ignore the letter as to that. He didn't say you can ignore the letter as to everything else that was in it. And Brandy had the prior experience that in the last prior 10 months, she had had her policy non-renewed for non-payment, canceled for non-payment each time she cured that. And then she knew after July that for months she had not been making any insurance payments. That demonstrated that she was aware that if you don't make payments, your insurance gets canceled. Now, as far as Mr. Kent is concerned, any claim that his statements could be interpreted by her to tell her that her policy was in force and disregarding everything else that she knew, which we had in the record in the summary judgment, you can't do that. And that's what the court held in the Young v. Allstate case, that a person claiming estoppel can't make that claim by disregarding all other information that the person knows or is accessible to that person. It was certainly accessible to Brandy that she had received a series of letters telling her the policy was inactive. That's why she ended up, one of those was the letter that said it's inactive, but you still owe us $329. And if you pay it, it's not going to reinstate your policy. She had that letter because she made the payment. She can't ignore that and say, oh, but I interpreted what Mr. Kent said to tell me that my policy was still in force. She simply can't do that. That's a very confusing letter. It says your policy, you owe us $329, but you don't have a policy. That's… It's for insurance previously provided. I understand what it's for, but if I just get a letter like that, you tell me I don't have insurance, but I owe you $329. I would question that. I don't know. Anyway, your time is up, sir. Any other questions? Just to follow up on what you said, Mr. Kent had no duty to tell them the policy was lapsing. Assuming that's true, that seems to be a different situation than when the insurer of the client calls Mr. Kent and says, I received this notice. I think I paid it now. Is everything okay? And then he says, yeah, you're good. That seems to be a different situation. But that's not what he says. She doesn't ask him, is everything okay? She asks him, did I pay this? And he checks and says, and he gets back to her and says, yes, you did make that payment. You can ignore the letter as to that. He doesn't say everything is okay. But he does say that you can ignore the letter. As to that. As to the question. As to that. But that presumes that she has some other kind of knowledge. No. The question that she asks is, did I make the payment? And he comes back and says, you did make the payment, so you could ignore the letter as to that. She was being done for $329 by a collection agency. That's all he was responding to. Okay. I'm going to go back and forth quite a bit. She says, which house is being paid? Is this being paid by the bank out of Escrow? Is this being paid by me? Is this my residence? Is this the rental apartment? They have quite a conversation back and forth. Not in the same conversation, but they have different. They leave emails or voicemails for each other. It's just those emails. But in those emails, she doesn't directly say, you know, is my policy in force? She doesn't ask him that question. And when she raises, did the bank pay this? In that prior period that Mr. Berg told you about, when the policy was not a year before, when the policy was not renewed, and the bank made the payment, and they said, okay, we'll treat this through the Escrow. But then they made an offer. This is the testimony. It's all in the record. The bank said, would you like us to put insurance payments in your Escrow account going forward? And Randy says, no. And the bank says, well, in that case, don't come back to us to ask us for money to make an insurance payment. It just seems like if you don't have a duty, or Mr. Kent has no duty to tell her her policy is latched. But she says, did I make a payment? And he says, yes, that payment was made. It almost seems like there should be a duty there to say, once you had this conversation going back and forth, yes, that payment was made, but that does not keep your policy in force. I mean, doesn't he have a duty to further explain that to her? He doesn't have a duty. And the cases that we've cited demonstrate that an insurance agent does not have a duty just to provide information. But he's not just providing. He's engaging in a conversation now. She's asking him questions. What's going on with my policy? Did I make a payment? He says, yes, it's made. That seems to imply you're good. I mean, he may not say the word specifically your policy is good, but it seems to imply a further duty to let her know you did make this payment, but that doesn't satisfy that your policy is in effect. I mean, what do you have an insurance agent for? If the insurance agent is just an agent for the insurance company, it's often described, he's an order taker. He has a duty that if you ask him to get particular insurance, he has to go and do that or tell you he can't do it. But there's a whole litany of cases, we've cited them in our brief, that the duties of the insurance agent have, the courts have constantly said, we do not expand it beyond what the statute says as it's been interpreted by the Supreme Court in the Skaberdash case. It's a very limited duty simply to respond to a specific request for specific insurance, but not a general duty to be a counselor or advisor to the insured. That's not the job of the insurance company's agent. Maybe it's the responsibility for an independent broker who gets hired by an insurer to go out and look around companies and act as an advisor. But the insurance agent who's the agent for the company, the insurance company, is not an advisor. Can you spell the name of that case you cited? Which one? Skaberdash. S-K-A-P-E-R-D-A-S. Okay. That's fine. Anything else, Justice Long? No, thank you. All right. Thank you very much for your time. Thank you, Your Honor. Mr. Kiyanka? Mr. Kiyanka, I would like you to respond to the issue of duty that was being discussed just now and is a concern to the justices. Yes. That was the issue on which the trial court ruled in favor of John Kent, that he didn't really have a duty under the insurance placement liability statute, which interestingly is in the Code of Civil Procedure for some reason, Section 2-2201. That statute and the site cases suggest that under the statute, there's no duty unless the person who wants the insurance specifically asks for coverage on that particular property. Well, you have to read that language in 2201 in the context of insurance situations. The 2201, the first part of it says, the agent, in this case, Kent, and Justice Case asked, is he an agent of the insured? I think so because that's what the country said. They said, contact your representative, John Kent. But the label doesn't really matter. The question is, what is the duty? Because there's no question that he's an insurance provider under the statute, 2-2201. So he's covered by the statute. But the statute says, renewing, procuring, binding, or placing the coverage requested by the insured. Well, certainly she wanted that policy to continue. She had that policy for five years. She is requesting, in effect, that that policy be renewed. She doesn't know that they think it's been canceled, so she's asking him to renew it. Or if it can't be renewed, apparently it's been, quote, canceled long enough that it can't be reinstated, but you can get new coverage. It could have gotten new coverage in five minutes. So that language is certainly broad enough, and it must be construed in the light favorable to the insured. That's how we construe these contracts. That's how we construe these statutes. So certainly she wanted that policy renewed. That was clear from the context. I think the e-mail exchanges are very, very important here, and we've detailed them in our brief. And in some cases, in the arguments, somebody omitted part of the November 6th e-mail. The second part of that e-mail says, also, it should be my bank paying for the home insurance on 2700 Western Avenue in Mattoon. They paid the previous balance, correct? Can you reach out to them about any nonpayment? Is that not a request that that policy be continued in force? Now, they talk about the council for-  I'm sorry? That was before the fire, that e-mail? That's before the fire, yes. That's all before the fire. That's a week or ten days before the fire. I'd like to, you heard the question that Justice Cates asked about the hypothetical, if we were to reverse this issue in summary judgment with relation to the estoppel claim. Would you address opposing counsel's statements where he said that even if we reversed, I think, that they should be barred, the estoppel claim should be barred? Tell me your thoughts a little. Yeah, I'm sorry. I didn't completely hear the full exchange on that. But the simple rules of procedure are that if this court reverses on the issue about whether there were proper notices of cancellation and, by the way, the point is they had to send three notices of cancellation, and we have good arguments on every single one of those, but they had to send a notice to Brandy, they had to send one to the bank, they had to send one to Chris. If this court reverses on any one of those, we go back to trial. Now, if it goes back to trial, it seems to me that there is no reason not to have this court tell the trial court to allow the amendment to the complaint. Did I misunderstand the hypothetical? There's no reason that can't be done. There's no prejudice to the defendant. There's no new facts. All the facts are in the record, so there might need to be a little bit of additional discovery, but the case has to be reset for trial anyway. So there's no downside to allowing the amendment in this case. The equities here are that that should be allowed. Do you think we should, if we send it back, we should order the trial court to allow the amendment, not just leave it to the trial court's discretion? Yes, I do. Yes, I do, Your Honor. I think that should be part of the disposition. Or if the court doesn't want to do that, they could send it back with directions to reconsider the motion to amend. But we would ask this court either to order the amendment, or we have asked that the court itself order the amendment under its power under Rule 360-something, that the court has the power itself to order the complaint amended. And there's no reason that should not be done. But let me answer Justice Kaye's question. Yes, the question really is duty. All the arguments they want to make are breach of duty, breach of duty. That's a question for the jury. And there's plenty of evidence in this exchange, there's plenty of evidence in this exchange, coupled with the fact that John Kent knew that policy had purportedly been canceled because he admitted he got that notice. It was in his file. But did he tell Brandy, oh, by the way, did you know this policy had been canceled? No, because he testified. He said, I was not required to do that. What made him required to do that? Why was he required to do that? He was an exclusive agent of Country Mutual. I'm sorry? He was an exclusive agent of Country Mutual. Yes, but he was also Brandy and Chris's representative. But legally, unless he voluntarily undertakes some responsibility. Well, I think he did voluntarily undertake. Your Honor, if you look at the email exchange, he said, yes, I can look into that, and I will. That's implied. I can reach out to them. But is the house currently rented or is it vacant? He misled them. He undertook that duty by misleading them, misleading Brandy, about whether that policy was still in effect. He knew it wasn't in effect. And the date of that email was what? I'm sorry? The date of that email? The date of that email is November 6th. And we detailed those in our brief, you know, date by date with a timeline. That was November 6th. The fire was the night of November 14th. So there was plenty of time for them to do that. If I could just conclude, Your Honor. Yes. Both defendants here, they want to try this case in the appellate court. It's not about whether she was delinquent on payment payments or what she should have done. All of that is irrelevant. To answer Justice Wong's question, what's the ultimate issue? The ultimate issue is, is there a question of fact? Is there a question of fact for the jury? Brandy and Chris are entitled to a jury trial on the issues that are issues of fact. And we have shown there are issues of fact as to the cancellation, reported cancellation, and as to John Kent. And so since it's a summary judgment, this Court should reverse and send it back and say, go on and go forward with the trial. Thank you very much. Thank you, gentlemen, for your arguments. Yes, Mr. Burns. I have just a point of clarification of the court rate. The police need to file a joint memorandum, a separate memorandum, in the next 10 days before the motion to leave to amend. No, not the motion to leave to amend. They filed a motion to cite supplemental authority. Correct. There was a second motion that they filed in the next or additional argument that was filed last Friday. It could be also included in our motion. I haven't seen that motion. What is it? What's the motion? Do we have a motion? Motion for leave to amend the reply brief. Motion for leave to amend the reply brief. What did you file last Friday? Supplementary brief with an additional paragraph on page 13. Oh, I have that. I was wondering what that page was. Do you have an objection to that? What I was asking is if we can include it in our memorandum, if we can address that as well. Do you want to give us a couple of pages? No, I don't want to give you a couple more pages. My colleagues would be very upset with me if I did that. I haven't seen it. We'll issue an order at the after conference. Let us take a look at it.